**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION**

**JERRY DALE SMITH**                                                                 **PLAINTIFF**

**V.**                                               **CIVIL ACTION NO.1:14CV195-SA-DAS**

**CAROLYN W. COLVIN**                                                             **DEFENDANT**

**<u>MEMORANDUM OPINION</u>**

This matter is before the court pursuant to 42 U.S.C. § 405(g) to review the decision of

the Commissioner of Social Security denying the application of Jerry Dale Smith for Disability

Insurance Benefits under the Social Security Act.  The parties in this case have consented to

entry of final judgment by the United States Magistrate Judge under the provisions of 28 U.S.C.

§ 636(c), with any appeal to the Court of Appeals for the Fifth Circuit.  After considering the

issues raised, the court finds as follows:

In this case there are two types of medical opinion evidence – the opinion of the treating

specialist who placed restrictions on the claimant that precluded his returning to gainful full-time

employment and the opinions of state disability determination specialists who opined that Smith

could perform a full range of light work.  The Administrative Law Judge (ALJ) rejected the

medical opinions in fashioning the plaintiff's residual functional capacity and found he could

perform a limited range of sedentary work. The decision of the ALJ is not supported by

substantial evidence.  Furthermore, the reasons given by the ALJ for finding the plaintiff's

complaints of pain less than fully credible do not support that finding.

**I. BACKGROUND**

After being injured in a motor vehicle accident on September 17, 2008, Jerry Dale Smith

applied for disability benefits.  His first application was denied and Smith did not appeal.  Smith

again applied for disability benefits, alleging that he became disabled on the date of his accident. This claim was denied initially and on reconsideration. His administrative hearing was held on April 17, 2013, and the ALJ issued an unfavorable decision on May 8, 2013. While finding that Smith could not return to his former employment, the ALJ gave little weight to the opinion of the treating physician and found that Smith was less than fully credible. He held that Smith could perform a limited range of sedentary work and, based on the testimony of the vocational expert, found that Smith could perform other jobs, namely lens inserter, order clerk, and optical goods assembler.

## A. Job History

Jerry Dale Smith was born in 1972 and has a high school education. He has past relevant work experience as a truck driver, a medium exertion level job, and as a derrick hand which requires heavy exertion. Since his accident he has made two unsuccessful work attempts. He worked from the end of February 2012 to early April 2012 performing a sedentary job operating controls in an office. He also attempted to return to truck driving. The exact duration of this second work attempt is not shown in the record, but the ALJ found neither of these attempts rose to the level of substantial gainful activity.

## B. Medical evidence

### 1. <u>Treatment records</u>

The plaintiff's treating physician, Dr. Craig Callewart, a board-certified orthopedic surgeon with a subspecialty in spinal surgery, first saw Smith on October 31, 2008. Smith complained of right-side neck, shoulder and hand pain, and right-side headaches since the

September accident.[1]  He reported he could not tolerate sitting; slept only four or five hours per night; and frequently dropped things with his left hand, but reported physical therapy improved range of motion in his neck.

Dr. Callewart noted a normal gait and erect stance and that Smith walked without assistance.  He found Smith had reduced strength of 4/5 in the left deltoid and in his biceps, though his reflexes were normal and there were no sensory deficits.  Smith's mood was normal though his significant history of depression was noted.  Cervical examination showed bilateral brachioplexus tenderness and rhomboid spasm.  The cervical spine x-ray examination showed loss of lordosis– a reversal of the normal  curvature of the cervical spine.  Callewart diagnosed cervical radiculopathy at C5-6 and prescribed medications for pain and muscle spasm.  He recommended bracing and a cervical MRI.

The radiology report of the November 25, 2008, non-contrast MRI showed intact cervical disks, adequate cervical spinal canal and neural foraminal space.[2]  Callewart read the MRI in December of 2008,  noting the kyphosis at L-3-4 and a "[b]road prolapse ... on saggital but not seen on axial, although his loss of lordosis tends to exacerbate the degree of compression."  Callewart  recommended continued bracing and cervical epidural steroid injections.  He told Smith the damage to his disk "might heal itself."[3]

By January 9, 2009, Smith was reporting numbness in his left lower extremity and problems with his leg giving way under him.  He continued to have migraine headaches.  He did

---

[1]  R. p. 231-32.  All record references, unless otherwise noted, are to Dkt 11, the administrative record and use the court's pagination.

[2]  R.p.  250.

[3]  R.p. 230.

not believe the brace was helpful.  Callewart found global weakness in the left lower extremity and continuing weakness in Smith's left upper extremity in the deltoid and triceps.  The diagnosis was unchanged.  The doctor recommended use of a cane and prescribed further cervical injections.[4]

On February 3, 2009, Smith reported sleep deprivation secondary to pain in the back of his head and in his neck.  He had numbness in his lips and hands and trouble dropping items held in his left hand.  Driving or riding in a car was painful, and the cervical epidurals failed to provide relief, as had the brace.  Smith reported problems with sexual functioning, nocturia, and bladder frequency.  His leg continued to give out on him.  His wife reported Smith sat at home and cried because he was in so much pain.[5]

Callewart found normal upper extremity strength, but the lower extremity exam showed 4/5 strength in his left hamstring and tibialis.  The lumbar exam showed tenderness in the left quadradtus and left gluteus medius.  The diagnosis was cervical radiculopathy due to C5-6 and left sciatica.  The doctor opined Smith was then medically unable to work.  A cervical CT and lumbar myelogram were recommended.[6]  On February 20, 2009, the doctor increased Smith's pain medications.[7]

On April 24, 2009, Smith reported his condition was worsening.  His left leg trembled and gave way on him.  He suffered severe sub-occipital headaches and noticed developing

---

[4]  R.p. 229.

[5]  R.p. 228.

[6]  R.p. 228.

[7]  R.p. 245.

atrophy in his left arm. He continued to experience sexual problems and problems with urination. He had difficulty holding the steering wheel with his left hand. He experienced no significant relief from the February cervical epidural, beyond the initial anesthesia. He was taking six to eight hydrocodone per day, plus Flexeril. In spite of his desire to remain active, he reported his actual activity level was down to nothing. Vicodin helped the pain, but caused nausea.[8]

On examination, his lumbar spine exhibited tenderness of the left quadratus and he had left sciatic tenderness. The cervical exam showed tenderness in the left brachioplexus. Manual testing showed 4/5 strength in the left biceps and wrist flexors, but no sensory deficits. The radiology report on the March 12, 2009, CT lumbar myelogram found a minimal central disc protrusion at L 2-3 and a minimal broad central bulge up to 1 or 2 mm at L4-5.[9] Callewart also read the myelogram detecting a prolapse at L4-5 of the trefoil canal.[10] The radiology report provides there was no clear evidence of spinal stenosis or foraminal narrowing.[11] Callewart noted the cervical CT was technically somewhat limited due to the patient's large shoulders,[12] but found narrowing of the canal at C 6-7 with "foraminal herniation on the left side best seen on image 4-83."[13] The diagnosis was left sciatica due to a prolapsed disc and primary stenosis

---

[8] R.p. 228-229.

[9] R.p. 248-249.

[10] R.p. 228.

[11] R.p. 248.

[12] R.p. 226. According to Smith's testimony he is 6'5" tall and weighs 300 pounds.

[13] R.p. 226.

5

along with cervical radiculopathy at C6-7. Callewart recommended surgical decompression posterior at left cervical 6-7.[14]

In June 2009 Smith reported his lower extremity was worsening, with almost daily drop attacks. He was unable to exercise because of pain. His neck and upper extremity symptoms remained the same, with loss of strength and problems dropping things. He was getting three to four hours of sleep per night because of the pain.[15]

The physical examination showed 4/5 strength in his left tibialis anterior and left quadriceps, without sensory loss. Callewart noted stenosis was present at C4-5 and L5-S1, based on his reading of the lumbar myelogram.[16] The diagnosis was left sciatica due to disc prolapse and primary stenosis with cervical radiculopathy at C5-6.[17]

In January 2010, Smith's condition continued to worsen as he continued to fall without warning and was troubled with lower extremity weakness. He had developed pain in the sternum and ribs and reported constant headaches. He had starting using a scooter to shop. He told Callewart he had undergone an upper extremity EMG which found bilateral carpal tunnel syndrome, with nerve damage on the right, but this report is not included in the administrative record. He continued experiencing dizzy spells and was taking eight pain pills per day. He reported his back pain was worse than the cervical pain.[18]

---

[14] R.p. 227.

[15] R.p. 225.

[16] R.p. 225.

[17] R.p. 225.

[18] R.p. 223.

Physical examination showed decreased strength in the left hip flexor and left evetor, abnormal reflexes and diminished sensation over the left gluteal and posterior thigh. The diagnosis remained unchanged.[19]

At his September 2010 visit, Smith continued to report back, neck and arm pain. The doctor again suggested surgical intervention, but Smith was unable to finance the surgery. There was no change from his previous neurological examination and his cervical range of motions was mildly restricted. The doctor "highly" encouraged Smith to pursue funding for the definitive care. [20]

Smith was seen again in February 2011 for refills, but was unable to have the surgery or new imaging studies done because he could not pay for either. He continued to experience sexual problems. The doctor's records note a physical examination was done but the results are not in the record.[21]

In July 2011, Smith again reported his condition continued to worsen. He was still falling frequently and the headaches continued. His back, neck, and buttocks were hurting and he reported left neck pain. He reported that his left footwear was separating due to his abnormal gait. His physical exam showed decreased strength in the left quad, left hamstring, left hip flexor and left hip evetor, without sensory deficit. He had lumbar tenderness and cervical

---

[19] R.p. 223

[20] R.p. 222.

[21] R.p. 221.

extension exacerbated his neck symptoms. Lumbar x-rays showed primary stenosis at L 4-5 and L5-S1. His medications were refilled.[22]

By December 2011, Callewart found a fifty percent restriction in Smith's cervical motion, with loss of strength in the left deltoid and left biceps, without sensory deficits. There was also loss of strength in the left lower extremity in the hamstrings, again without sensory deficits. Smith was continued to drop things.[23]

In March 2012, Smith again reported neck pain, severe headaches, and subjective weakness and numbness in the left upper extremity, along with left lower extremity numbness. On that date he denied any back pain but reported persistent headaches and neck pain. He could not do any heavy lifting with his left arm; was dropping objects and described numbness in his hand which the doctor noted covered the 6th and 7th dermatome. Physical examination revealed diffuse cervical tenderness. Examination of the upper extremities demonstrated mild decrease in left hand grasp with some tricep weakness as compared to the right. His reflexes were intact and he had a negative Hoffman on examination of the upper extremities. His medications were refilled.[24]

The June 2012 examination found Smith with worsening shoulder pain, hand pain, and scapular numbness, plus left leg pain that was worse than the back pain. With bilateral shoulder issues, Smith reported getting periodic injections from a shoulder specialist.[25] The neurologic

---

[22] R.p. 267.

[23] R.p. 289-290.

[24] R.p. 288.

[25] These records are referenced in Callewart's notes, but not included in the record.

exam was unchanged with some limitation of cervical movement and range. Smith exhibited left root tension on his lumbar examination. Callewart recommended another lumbar MRI secondary to his increasing leg pain, as well as a cervical MRI for the radiculopathy.[26]

## 2. Medical Source Opinions

The record shows four medical source statements from Dr. Callewart. In the first statement on April 13, 2011, Callewart opined that Smith was disabled and in need of both cervical and lumbar surgery, which had not been performed because of Smith's finances. He based this opinion on Smith's "inability to sit, stand, or repetitively use his upper extremities."[27] In Callewart's second letter, dated May 4, 2011, he noted that Smith suffered from neck pain, right-sided headache, left-sided arm pain, weakness and numbness, as well as left leg pain and numbness. He also had lumbar problems. He opined that he continued to be disabled from his past work as a truck driver. He again reiterated that he did not feel Smith could work a full time job because of his inability to sit, stand, or repetitively use his upper extremities.[28]

Callewart's spinal impairment questionnaire, dated June 10, 2011, notes that Smith has a fair prognosis with surgery, but his condition would not improve without surgery. Callewart noted limited range of motion on flexion and extension in the neck, with paraspinal tenderness, muscle spasm and sensory loss at C5-6 and tricep weakness due to the neck impairment. There was limited range of motion on extension and flexion in the lumbar region with gluteal tenderness, lumbar muscle spasm, sensory loss in the left leg and muscle atrophy in the left

---

[26] R.p. 330.

[27] R.p. 253.

[28] R.p. 256.

quadriceps.  Smith was noted to have multiple areas of swelling, crepitus and trigger points.  He

had a positive straight leg raising test on the left.  Callewart referenced the cervical and lumbar

myleograms as support for his findings on this questionnaire.  Callewart said his patient had

constant neck pain which radiated bilaterally down the arms and low back pain that radiated

down his left leg.  The pain was constant and could not be completely relieved by medication.[29]

Callewart's spinal questionnaire found Smith could sit or stand 0-1 hours per day; would

need a sit/stand option, would require ten minute breaks each hour; could occasionally lift ten

pounds and could occasionally carry five pounds.  His symptoms would frequently interfere with

his attention and concentration.  Though Smith suffered from depression he could handle

moderate stress.  Smith was not capable of maintaining a static neck position in order to do

computer work and Callewart estimated that he would miss work three times per month.  He

recommended that Smith avoid humidity and wetness and found that he should do no pushing,

pulling, kneeling, bending, or stooping.[30]

Finally in his letter of December 2011 – a medical source statement not mentioned by the

ALJ – Callewart noted his patient continued to suffer from cervical and lumbar radicular

symptoms "which are worsening;" that his past work was heavy labor and opined Smith could

not return to such employment.  "With both upper extremity and lower extremity neurologic

deficit, sitting and standing and restricted repetitive use of upper and lower extremities, he is

---

[29] R.p. 258-260.

[30] R.p.  261-264.

more than likely unemployable for clerical/desk or sedentary work.  Therefore, he is totally disabled."  Callewart noted his patient needed surgery to help improve his medical status.[31]

There are two medical source statements in the record from consulting, non-examining physicians, Tina Ward and Laurence Ligon.  In the first, from August 2011, Ward opined, without benefit of reviewing any MSS from the treating physician, that Smith could lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk for 2-4 hours out of 8; sit 6 hours of 8; and had unlimited ability to push/pull and operate hand and foot controls.  The doctor found Smith was limited to occasionally climbing, balancing, stooping, kneeling, crouching, and crawling.  No limitations were placed on his ability to manipulate and there were no environmental limitations.  This physician supported the assessment by noting a normal gait and erect stance on two of the visits.  Dr. Ligon's opinion notes the July 2011 records and the loss of strength in the upper extremity but confirms Ward's RFC  from August. [32]

### C.  Claimant's testimony

Smith testified to symptoms generally consistent with those reported in Dr. Callewart's medical reports.  He testified about his work attempt at Crest Pumping from February 25, 2012 to April 3, 2012 describing a sedentary job.[33]   He said he left the job because he was unable to remain seated because of pain.  He had trouble staying focused on the job and experienced pain, stiffness, headaches, and numbness in his arms and legs.  Though he has a documented history of substance abuse, he testified that he was neither drinking nor using any illegal drugs at the time

---

[31]  R.p. 285.

[32] R.p. 269-276, 283.

[33]  "So you are just sitting in an office somewhere watching and using the switchboard to put cement into the truck."  R.p. 41.

of the hearing.[34]  He testified that he stopped working because of the motor vehicle accident in

2008.  He testified that Callewart had recommended neck and back surgery and that he had not

had the surgery because he was unable to pay for the care.  He was prescribed Flexeril,

Hydrocodone and Percocet for pain which did not completely relieve his pain.  The numbness in

his left arm ran down the back of the arm into his hand into his last three fingers and thumb.  He

also had numbness down his left leg.  He continued to fall two or three times per week and had

been injured in some of his falls.  He had some type of headache every day.  He testified that he

could sit for 30-45 minutes and stand for 30-45 minutes.  He did not think he could do a job

alternating between sitting and standing because the time he could tolerate either sitting or

standing would decrease as he continued to alternate between positions.  Past a certain point,

switching positions would not longer relieve the pain, and he would need to recline to relieve his

pain.  He spent a few hours each day in a reclining position because of the pain.  He could lift or

carry 8-10 pounds.  He could lift and place a gallon of milk into a shopping cart, but not without

pain.  He has difficulty holding items in his hand because of numbness.  Sometimes he drops

things because of  numbness and other times he may crush things he is trying to hold for the

same reason.

Smith said he gets "real depressed" and has problems with anger and his attention span.

He also gets very emotional.  He is so forgetful he relies on his wife to remind him to take

medications.  He has trouble with insomnia.  On a bad day he stays in his chair most of the day.

On a good day, maybe twice a week, he can go out in the yard and hang out with his kids or go

to town with his wife.  He is no longer able to enjoy his pre-accident hobbies of boating,

---

[34] R.p. 42.

camping and riding four wheelers. He is largely able to take care of his personal needs, but has Velcro closings on his shoes. He can drive for up to forty minutes, but will be sore for a day after such a trip. He testified that he would love to be able to work and would give up everything to "go back to the way it was."

### D. Vocational testimony

The vocational expert testified that Smith's past relevant work as a truck driver was medium, semi-skilled work. His past work as a derrick hand was heavy work. The ALJ's first hypothetical assumed capacity for light work, with a sit-stand option, and limited to occasionally pushing and pulling, operating foot controls, balancing, stooping, kneeling, crouching and crawling, but no manipulative, visual, communicative or environmental restrictions. The VE testified that such a person could not perform Smith's past work, but could work as a parking lot attendant, laundry folder or bench assembler. With the exertional level reduced to sedentary, Smith could work as a lens inserter, optical goods assembler and order clerk.

The VE testified that there would be no work available if an individual was able to work or stand less than one hour in an eight-hour day. There would be no jobs for an individual who needed a ten minute break every hour; would miss three days of work per month; or needed to elevate their legs for three hours per day.

### E. The ALJ's decision

The ALJ found the claimant had not engaged in substantial gainful activity since September 17, 2008. His last work activity in October 2012, as a truck driver, did not rise to the level of substantial gainful activity. He found Smith had the following severe impairments :

cervical disc prolapse and radiculopathy, and poly-substance dependence in sustained partial remission.[35]

While acknowledging Smith's treatment for bipolar disorder and depression, the ALJ held that his anxiety and depression were not severe impairments. The ALJ found that Smith's claimed carpal tunnel syndrome was not a medically determinable impairment, because there was no such diagnosis in the record and no complaints related to carpal tunnel syndrome.

At Step Four, the administrative law judge found that the claimant could perform less than a full range of sedentary work, but the decision omits listing the additional limitations. The parties have spliced the restrictions from two hypothetical questions posed to the VE at the hearing in order to construct the plaintiff's RFC. In the first hypothetical, the ALJ asked the VE to assume the capacity to perform light work with a list of additional restrictions.[36] The ALJ then asked the VE, "If I reduce the exertional level to sedentary, would there be work available?"[37] The parties, and now the court, are taking the additional limitations from the first question as understood by both the ALJ and the VE to be included in the second question.

After a brief review of Callewart's records, the ALJ refused to give any weight to the Callewart's first two opinions, finding they addressed the issue of Smith's disability, an issue

---

[35] This severity finding is ambiguous. The medical records show the claimant has well-documented problems not only with his cervical spine, but also in his lumbar spine, including radiculopathy in both areas. There is no explicit severity finding with regard Smith's lumbar conditions at Step 2, nor does the ALJ find that it is *not* a severe condition as he does with other complaints. Because the ALJ's decision does include later references to Smith's lower back problems, both parties, and now the court, are assuming that the lumbar condition was included as a severe condition at Step 2.

[36] To further complicate matters, the transcript has a small part in the listing of restrictions that was inaudible. [R. 58] The court is relying on the parties representation that the inaudible portion of the transcript stated that Smith could sit six hours of eight, which does appear to be a reasonable assumption.

[37] R.p. 59.

reserved for the Commissioner. He then discussed Callewart's findings on the Spinal Impairment Questionnaire finding the restrictions – which would preclude Smith working – were not supported by the medical evidence; that Smith's impairments were not so severe as to preclude his working and mistakenly finding that Callewart had at another time opined that Smith could perform light work.[38] The ALJ's decision fails to mention the final MSS from Callewart, in which he describes his patient's condition as worsening.

After his finding that he would give little weight to Callewart's opinions, the ALJ referred to Callewart's March 13, 2012 examination where the doctor found Smith was unable to use his left arm for any heavy lifting and his diagnosis of left sciatica due to "disk prolapsed, primary stenosis, cervical radiculopathy due to C5-6 and left sciatica." The ALJ noted that Smith had no sensory deficits and that his reflexes were intact.[39] The ALJ then noted the physical capacity opinions of the state disability doctors who found Smith could perform a full range of light work. The ALJ discussed the claimant's testimony and, though finding his underlying impairments could reasonably be expected to produce his symptoms, discounted his statements about the intensity, persistence, and limiting effects of his symptoms. The ALJ gave nine reasons for doubting Smith's credibility: four based on Callewart's findings; one based on a non-examining doctor's opinion that he could perform an unlimited range of light work; Smith's denial of current alcohol and drug use; his activities of daily living; the fact that Smith's mental problems were determined to be non-severe; and the fact that Smith did not sustain any broken bones in the 2008 accident.

---

[38] R.p 28.

[39] R.p. 27.

The ALJ concluded that Smith could not perform his past relevant work as a truck driver or as a derrick hand, but, based on the opinion testimony of the VE, found there were other jobs which Smith could perform.

## II. STANDARD OF REVIEW

This court's review of the Commissioner's decision is limited to an inquiry into whether there is substantial evidence to support the findings of the Commissioner, *Richardson v. Perales*, 402 U.S. 389, 401 (1971), and whether the correct legal standards were applied. 42 U.S.C. § 405 (g.); *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990). Substantial evidence has been defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perales*, 402 U.S. at 401 (quoting *Consolidated Edison v. NLRB*, 305 U.S. 197, 229 (1938)). The Fifth Circuit has further held that substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988) (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)). Conflicts in the evidence are for the Commissioner to decide, and if substantial evidence is found to support the decision, the decision must be affirmed even if there is evidence on the other side. *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990). The court may not reweigh the evidence, try the case de novo, or substitute its own judgment for that of the Commissioner, *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988), even if it finds that the evidence preponderates against the Commissioner's decision. *Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1994); *Harrell*, 862 F.2d at 475. The court must however, in spite of its

limited role, "scrutinize the record in its entirety "to determine the reasonableness of the decision ... and whether substantial evidence exists to support it." *Randall v. Sullivan,* 956 F.2d 105, 109 (5th Cir. 1992). If the Commissioner's decision is supported by the evidence, then it is a conclusive and must be upheld. *Perales*, 402 U.S. at 390.

### III DISCUSSION

In determining disability, the Commissioner, through the ALJ, works through a five-step sequential process.[40] The burden rests upon the claimant throughout the first four steps of this five-step process to prove disability. If the claimant is successful in sustaining the burden at each of the first four levels, the burden then shifts to the Commissioner at step five.[41] First, the claimant must prove he is not currently engaged in substantial gainful activity.[42] Second, the claimant must prove his impairment is "severe" in that it "significantly limits his physical or mental ability to do basic work activities...." [43] At step three the ALJ must conclude the claimant is disabled if he proves that his impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1, § § 1.00-114.10 (2011).[44] Fourth, the claimant bears the burden of proving he is incapable of meeting the physical and/or

---

[40] *See*, 20 C.F.R. § 404.1520 (2012).

[41] *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991).

[42] 20 C.F.R. § 404.1520(b) (2012).

[43] 20 C.F.R. § 404.1520(c) (2012).

[44] 20 C.F.R. § 404.1520(d) (2012). If a claimant's impairment meets certain criteria, then claimant's impairments are of such severity that they would prevent any person from performing substantial gainful activity. 20 C.F.R. § 404.1525 (2012).

mental demands of his past relevant work.[45]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, considering the claimant's residual functional capacity, age, education and past work experience, that he is capable of performing other work.[46]  If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove that he cannot, in fact, perform that work.[47]

In the present case the claimant argues that the ALJ failed to properly evaluate the medical evidence; failed to properly assess Smith's residual functional capacity; and improperly evaluated his credibility.

## ASSIGNMENT ONE: EVALUATION OF MEDICAL OPINION AND RESIDUAL FUNCTION CAPACITY ASSESSMENT

In his first assignment, the plaintiff asserts that the ALJ failed to properly weigh the medical opinion evidence of the treating physician and failed to properly determine the plaintiff's residual functional capacity.  The court has broken this assignment into three related issues:

1.  Whether the ALJ erred in failing to give controlling weight to Dr. Callewart's medical opinions in accordance with *Newton v. Apfel,* 209 F.3d 448, 455 (5th Cir. 2000);

2.  Alternatively, whether the ALJ erred when he did not give substantial weight to Dr. Callewart's medical opinions, and when he failed to discuss the *Newton* factors before giving the treating physician's opinions little weight; and

3.  Whether the ALJ failed to properly assess Smith's residual functional capacity.

---

[45] 20 C.F.R. § 404.1520(f) (2012).

[46] 20 C.F.R. § 404.1520(g)(1) (2012).

[47] *Muse*, 925 F.2d at 789.

**1. Must the ALJ give Controlling Weight to the Treating Physician's Opinions?**

The regulations, rulings and case law all dictate that a "treating physician's opinion of the nature and severity of the patient's impairment will be given controlling weight if it is 'well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with... other evidence.' " *Newton*, 209 F.3d at 455 (quoting 20 C.F.R. § 404.1527 (c)(2));[48]*see also*, SSR 96-2p, 1996 WL 374188(July 2, 1996)(" a well-supported opinion from a treating source that is not contradicted by other substantial evidence in the record must be adopted.").

In the present case, the plaintiff argues that the ALJ was required to give Callewart's opinions controlling weight in assessing Smith's residual functional capacity. The issue is critical to Smith's appeal because it is admitted that giving those opinions controlling weight means Smith must be found disabled. The plaintiff argues the ALJ had to give controlling weight to Callewart's assessment because it is uncontradicted by any examining source; is supported by the appropriate medical testing in the form of x-rays, MRIs and CT scans; and is not contradicted by any other substantial evidence. Plaintiff insists the doctor's opinions are also consistent with and supported by his clinical findings on examination. They also point to the ALJ's error when he explained that Callewart found his patient able to perform a full range of light work, asserting that this factual mistake was prejudicial.

The defendant counters with several arguments. First, it argues that Callewart's opinions are inconsistent with his objective clinical findings throughout his treatment records pointing to some normal or less severe clinical findings found in the records. Second, the defendant argues

---

[48] This was 20 C.F.R. § 404.1527 (d)(2) at the time of the *Newton* decision.

the radiology reports do not show conditions serious enough to support the treating specialist's opinions, citing *Greenspan v. Shalala*, 38 F.3d 232 (5th Cir. 1994) and *Zimmerman v. Astrue,* 288 F.App'x 931, 935 (5th Cir. 2008) and urging that Callewart's opinions are, therefore, not well-supported by the medical evidence. Third, the defendant suggests that other substantial, non-medical evidence contradicts and undermines the treating physician's opinions, citing the plaintiff's two unsuccessful work attempts as proof that his limitations are less severe than those described by Callewart. Fourth, the defendant points to the assessment by the state disability determination specialist that Smith could perform a full range of light work. And in its fifth and final argument, the one point on which the defendant concedes error-- the mis-attribution of the non-examining physician's "light work" assessment to the treating specialist--the defendant argues the error is harmless because the ALJ's determination is otherwise supported by substantial evidence.

The court agrees with the plaintiff that the ALJ's opinion does not justify his refusal to grant controlling weight to treating specialist's opinions. The court rejects the Commissioner's arguments to the contrary. First, the Commissioner seeks to offer explanations for rejecting the treating specialist's opinions that are not included in the ALJ's opinion. The court cannot consider these arguments because the decision must "stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Newton*, 209 F.3d at 455, citing *Knipe v. Heckler*, 755 F.2d 141, 149, n. 16 (10th Cir. 1985) and *Dong Sik Kwon v. INS,* 646 F. 2d 909, 916 (5th Cir. 1981) (en banc). If the ALJ's decision cannot be affirmed based upon the reasoning provided by the ALJ, then it must be reversed. The decision cannot be salvaged by the *post hoc* rationalizations offered by counsel for the defendant. The court will consider and

weigh only the explanations provided by the ALJ's decision, and in this case, the ALJ has offered scant support for that decision.

After listing the work restrictions given by Callewart, the ALJ decided to give little weight to those opinions, finding:

> The conclusions reached by Dr. Callewart in Exhibit 5F are not supported by the medical evidence of record. The claimant does experience some limitations; however, the conclusions by Dr. Callewart would preclude all work activity. Dr. Callewart examined the claimant's medical records and found that he could do a full range of light work activity. The record does not support a finding that the claimant is precluded from engaging in all work activity as this questionnaire would indicate. The Administrative Law Judge gives little weight to the statements and findings set out in the June 10, 2011 Questionnaire completed by Dr. Callewart. [R. 23].

The explanation offered amounts to three conclusory statements and a serious factual mistake about the record. Stating that the opinions are "not supported by the medical record" provides no insight into the ALJ's reasoning and provides no basis for appellate review. Likewise, the ALJ's statements that Callewart's restrictions would preclude work activity, but the "the record" does not support such a finding is vague and conclusory.

The only factual statement provided by the ALJ to justify his dismissal of Callewart's opinions erroneously attributes to the treating specialist, the opinions of the non-examining physicians that Smith could perform a full range of light work. Though, the defense of this error is the defendant's last argument, the court addresses it first. The plaintiff argues that the ALJ's error in attributing the non-examining physicians' opinions to Callewart is prejudicial error. The Commissioner admits the ALJ made a factual error but contends the error is harmless. The court disagrees. Just as the court may not accept explanations not offered in the ALJ's opinion, it cannot ignore or "disregard statements made by the ALJ" in support of the decision. *Randall*,

956 F2d at 109. The decision itself is the "only insight we have into the ALJ's decision making process...." *Id.* (reversing an ALJ's decision where the ALJ relied on a negative EMG for a third person, when claimant's EMG showed bilateral radiculopathy).

The ALJ mistakenly assigns this unfavorable opinion to the treating physician and in the very next paragraph, the ALJ discusses the opinions of the Drs. Ward and Ligon, who did opine that Smith could do light work. Given the proximity of the error to the correct attribution of these opinions, it is reasonable to infer that this is the ALJ's misunderstanding of the record, not a scrivener's error.

Even looking elsewhere in the opinion for other statements that could be construed to support the his "little weight" determination, there is little content. For example, he notes that Callewart said early in the plaintiff's treatment that his disc problem "might self heal." Because this hopeful "maybe" did not materialize, it does not undermine or contradict the later opinions.

The Commissioner also argues that the treatment record and notes are inconsistent with the doctor's opinions, and in support of her argument, references some normal or near normal findings and describes the doctor's findings as mild. The Commissioner points to several instances in which the plaintiff was found to have a normal gait and an erect stance. Smith, it is noted did not use a cane or walker. The defendant notes that early in treatment, when Smith was found to have reduced strength in his left deltoid and biceps, the doctor found normal strength in all other muscle groups. The argument highlights repeatedly those notes which found Smith had normal reflexes or no sensory deficits; plus an early lower extremity neurological examination without sensory deficits. The defendant notes one later finding of only mildly limited range of cervical motion, and points to an exam in which the doctor found no lower extremity motor

deficit, though the same examination found left root tension signs. The defendant suggests that these clinical findings are mild and do not translate to the level of restrictions found by Callewart, and therefore justify the ALJ's decision.

This argument, however, offers evidence to support the decision, not referenced by the ALJ as justification. Additionally, as will be discussed later in more detail, the defendant is trying to translate clinical findings into functional limitations in order to reject the doctor's limitations without the support of expert medical advice. The defendant is "playing doctor" and inviting this court to do the same, something neither is qualified to do. *Frank v. Barnhart,* 326 F.3d 618 (5th Cir. 2003); *Balsamo v. Chater*, 142 F.3d 75 (2nd Cir. 1998).

Finally this part of the argument cherry-picks the record. Pointing to more normal or less severe findings is not a compelling argument, particularly when most of the findings the Commissioner points to cluster early in the course of treatment; the doctor describes his patient's condition as worsening, and the treatment record corroborates that description. The court has included a lengthy summary of the medical records, noting both normal, mild, and more serious clinical findings. The record shows the treating specialist's recommendation for lumbar and cervical surgery, surgery not done only because Smith could not pay. The selected findings by the Commissioner present a skewed picture of the record. Even without looking at the record as a whole, the selections from the medical record show at most that Smith is not a complete invalid, but he need not be an invalid or bed-ridden to qualify for benefits. *Id.* at 81. Futhermore, these milder findings do not contradict either the more serious early clinical findings and observations or the increasingly serious findings later in the record. Perhaps the most telling demonstration of how the defendant's portrayal of Smith's condition is the result of

cherry picking is the following inverse of the defendant's summary: A listing of only the more serious of Callewart's notations.

> 1. Decreased strength: Left deltoid, left biceps, left wrist flexors, continuing and global weakness in left lower extremity, left tibialis anterior, left quadriceps, left hip flexors, left hip evetor, left hamstring, left tibialis.

> 2. Sensory deficits: Numbness in lips, hands, left lower extremity, diminished sensation and numbness in left gluteal, left posterior thigh, left hand numbness in 6th and 7th dermatome.

> 3. Tenderness: Brachioplexus, left quadratus, left gluteus medius, left sciatic tenderness, diffuse cervical.

> 4. Spasm: Cervical, rhomboid and lumbar.

> 5. Loss of motion: Cervical-up to 50% loss of range of motion; loss of cervical range of motion on extension and flexion; cervical extension exacerbates symptoms.

> 6. Anatomic abnormality: Loss of cervical lordosis, left arm atrophy, left quadriceps atrophy.

> 7. Other diagnostic findings/recommendations: Neck bracing and use of cane, surgical decompression of left cervical 6-7, and lumbar decompression. Left sciatica, severe sub-occipital headaches, neck pain, left neck pain, cervical radiculopathy, left sciatica due to prolapsed disc and primary stenosis.

The court is unpersuaded by the defendant's attempt to show inconsistency between Callewart's treatment records and the opinions he provided.

The Commissioner also argues that Callewart's opinions are not medically well supported, and contends the radiological findings do not support Callewart's opinions, citing *Greenspan v. Shalala*, 38 F.3d 232 (5th Cir. 1994) and *Zimmmerman v. Shalala,* 288 F. App'x 931 (5th Cir. 1998). While it is true that ALJ's must consider whether medical testing supports a doctor's findings as part of his assessment of the weight to be given a doctor's opinions, it appears to the court, after exhaustive review of the record that the ALJ has instead adopted his

own medical opinion. Neither *Greenspan* or *Zimmerman* provide authority for finding Callewart's opinions are unsupported by the radiological findings.

The defendant has argued that the radiological findings "do not support Dr. Callewart's extremely restrictive proposed limitations" and that the reports indicate "no more than mildly abnormal findings and undermine Callewart's claims.[49] This argument, in addition to being absent from the ALJ's decision, ignores Callewart's reading of the radiological evidence itself. Callewart read the initial MRI himself and found "Broad prolapse is noted on the sagital but not seen on axial,"[50] This diagnosis was accepted by the ALJ when he found Smith's severe impairments included "cervical disc prolapse and radiculopathy"[51] The defendant also fails to mention Callewart's supplemental reading of the lumbar myelogram which found a prolapse at L4-5 of the trefoil canal, narrowing of the canal at C6-7, with foraminal herniation on the left side "best seen on image 4-83."[52] It also fails to recognize Callewart's recommendations of surgical intervention in both the cervical and lumbar spine and the previously enumerated abnormal findings on physical examinations of Smith.

While another doctor might look at the same record and same radiological examinations and offer opinions differing from Callewart's, that is not the same as finding his opinions are not supported by the medical evidence. Even setting aside Callewart's supplements to the radiology reports, the ALJ can find the radiology does not support the doctor's opinions only by

---

[49]  R. Dkt 17, p 7-8.

[50]  R.p. 230.

[51]  R.p. 25.

[52]  R.p. 226.

substituting his medical judgment about the significance of the reports for that of the specialist, because he failed to seek and obtain any supporting expert medical opinion to make a different finding.

What do the cases cited by the defendant, *Greenspan* and *Zimmerman* mean when finding an opinion is not supported by medically acceptable testing? Callewart's reading of the tests, coupled with his clinical findings from multiple physical examinations lead him to recommend surgical intervention for both the cervical prolapse and decompression surgery in the lumbar spine. He clearly found the results serious and significant. The defendant, to the contrary, suggests these tests are only "minimally" abnormal and therefore not supportive of the doctor's opinions.

In *Zimmerman*, unlike this case, there was competing firsthand medical evidence that contradicted the treating physician's opinions and other records showing full motor strength and effective pain relief. *Id.* at 935-36. The *Zimmerman* court expressly found Newton's treating physician's rule was inapplicable to the case. But the court's opinion does not hinge on these references to the medical records. Rather, the ALJ's decision was supported by the contradictory findings of an examining physician, plus Zimmerman's testimony about his daily activities including shopping and carving ornate wooden canes. *Id.*

The *Greenspan* case is one of the more widely cited cases in this circuit and authority for what constitutes "good cause" for a finding that a treating physician's medical opinion is unsupported by the medical evidence. Strangely, *Greenspan's* widely quoted language about good cause for disregarding medical opinions arose in a case to which *Newton's* treating physician rule had no direct application. In *Greenspan*, the plaintiff challenged the ALJ's

decision when he disregarded the opinions of some of her treating physicians, who issued opinions favorable to her claim, though contradicted by multiple examining and *treating* physicians and medical sources. 38 F.3d at 237-38.

Patricia Greenspan had a past work history that included a large number of jobs, each held only for a brief time. *Id.* at 234. A single-spaced listing of her symptoms and complaints occupies four and one-half inches in the Fifth Circuit's printed opinion. She was seen for two years by a Dr. Feldman, a specialist in allergy and immunology and a "clinical ecologist." Feldman said Greenspan was "severely affected with ecological illness and multiple allergies." *Id.* at 235. She was also seen by Drs. Rhea and Smiley, also specialists in "clinical ecology" and "environmental medicine." Rhea's records consisted of his recording Greenspan's subjective reactions to various allergens. While Rhea found some evidence of Epstein-Barr virus, Greenspan failed to have the follow-up testing necessary to establish the diagnosis. Based on his observations, Rhea said Greenspan could not perform any job because of her of her immune system dysfunctions. *Id.* at 235.

Contradicting this evidence, other physicians who treated Greenspan, found no physical basis for her complaints, but significant emotional overlay. Greenspan had been counseled by a psychology intern; seen by Drs. Gaylis, Azen, and Fox; and treated by multiple other physicians and interns at two hospitals. None of these doctors found any physical basis for her complaints. *Id.* at 234-35.

A consulting psychologist found no evidence of psychological dysfunction, a finding in which a consultative psychiatric examiner concurred. *Id.* at 235. A consulting examining internist found no objective evidence of any major illness and assigned only an environmental

limitation that Greenspan should avoid exposure to dust.  *Id.*  A clinical psychologist evaluated

Greenspan and diagnosed atypical somatoform disorder and histrionic personality.  *Id.*  An

internist, a Dr. Mulhauser, reviewed her medical records and submitted a report finding there

were no objective medical findings of any immune deficiency or any physical explanation for

her symptoms.  *Id.*  He also advised that there was no such thing as an ecologic illness, an

opinion the ALJ accepted.  *Id.* at 237.

A consulting allergist performed RAS tests for allergies that were all negative.  The

allergist also reported that the claimant's dermographia could cause false positive results in the

skin allergy tests performed by the environmental specialists.[53]

Therefore Greenspan involves a case with substantial evidence, in fact, overwhelming

evidence to support the ALJ's rejection of the opinions of the "ecological" treating physicians.

As the court in *Greenspan* found  their  diagnoses "were based upon dubious medical

techniques" and were conclusory and were contradicted "by both itself and outside medical

evidence."  *Id.* at 237.  The court noted "few recognized medical techniques were used by the

doctors."  *Id.*  *Greenspan* is clear authority for the rejection of the opinions of treating physicians

based on "junk science," and even then expert medical opinion in the record established that the

ALJ was dealing with "junk science."

While the court does not mean to suggest that *Greenspan,* because of its peculiar facts is

limited in its application to cases involving "junk science," *Greenspan* does not support denying

controlling weight in the present case.  Standing in stark contrast to the facts of *Greenspan*,

---

[53]  Demographia is the raising of whelps on the skin resulting from moderately firm
stroking or scratching of the skin. *Id* at 235.

Smith's record contains the uncontradicted, internally consistent treatment records, the appropriate objective medical testing used by specialists dealing with spinal complaints, and the opinions of Smith's treating specialist.  The only contrary medical proof, because it comes from non-examining sources, does not as a matter of law provide substantial evidence to support the ALJ's decision.  *Villa*, 895 F.2d at 1022-23.

The court notes the ALJ twice mentioned that Smith sustained no broken bones in the September, 2008 accident.  This ALJ clearly did not believe Smith sustained serious injuries in the wreck because he did not suffer broken bones.  An ALJ may not "draw his own medical conclusions from some of the data, without relying on a medical expert's help." *Frank*, 326 F. 3d at 621-22 (An ALJ improperly decided that atrophy would be present as a result of the claimant's alleged impairments).  As Judge Posner warned: "[J]udges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor ....  The medical expertise of the Social Security Administration is reflected in regulations; it is not the birthright of lawyers who apply them. *Common sense can mislead; lay intuitions about medical phenomena are often wrong*." *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990) (emphasis added).  In *Schmidt,* a former executive claimed he could not return to his high stress employment because of a heart condition.  An ALJ disagreed relying on testimony that the claimant was very physically active, including playing racquetball forty minutes per week.  While affirming the result on other grounds, the Seventh Circuit found the ALJ could not substitute his medical judgment for the judgment of a doctor.  *Id.*.

In this case it appears that the ALJ's "common sense" test for the severity of an accident and resulting injuries based on the presence or absence of broken bones was substituted for the

opinion of a highly trained specialist, without supporting expert medical evidence. In *Williams v. Astrue*, 355 Fed.Appx. 828 (5th Cir. 2009), the Fifth Circuit reversed an ALJ's decision when an ALJ rejected the opinions of three treating physicians who supported the claimant's claim for disability. In the words of the Fifth Circuit, the ALJ "parsed through William's medical record, including MRI's, consultative examinations and the claimant's complaints; pointed to one doctor's findings 'of disc bulges and protrusions' and only moderate stenosis and concluded that the symptoms had waxed and waned, but the claimant was not eligible for benefits." *Id.* at 830. There the Fifth Circuit found the ALJ wrongly substituted his medical judgment for that of the doctors in assessing the RFC. "[T]he ALJ impermissibly relied on his own medical opinions as to the limitations presented by 'mild to moderate stenosis' and 'posterior spurring' to develop his factual finding." *Id.* at 832.

This court further finds this is not a case where "other substantial evidence" referenced by the ALJ undermines the treating physician's opinions. Callewart has not been inconsistent with his opinions and his medical reports are not internally inconsistent. His spinal questionnaire is not just check-marks on a form, but references specific clinical findings from his examinations plus the CT scans and myelograms. Smith's testimony about his limitations is consistent with Callewart's findings and limitations. The contradictory sources are the non-examining physician's opinions and the ALJ's opinion based on his "broken bones" theory.

The Commissioner also suggests the plaintiff's two failed work attempts justify discounting the orthopedist's opinion. The ALJ did not reference the plaintiff's unsuccessful attempt to perform sedentary work. His attempt at office work lasted twenty-five work days and

ended, according to Smith, because he was unable to sit still long enough to do the job. He left the job because of the pain. This work attempt does not undermine the doctor's opinions.

Though not given as an explanation for limiting Callewart's opinions, the ALJ briefly mentioned Smith's attempt to return to truck driving. He noted that he could not determine the duration of this work attempt but held at step one that it did not rise to the level of substantial gainful activity.[54] The ALJ also determined that Smith's RFC precluded a return to this past relevant work. A work attempt of unknown duration and scope is not substantial evidence to support rejecting Callewart's opinions. Any inference drawn from such a crumb of information is necessarily speculative. Additionally, as a matter of law, the opinions of the non-examining physicians, though referenced by the ALJ, cannot rise to the level of substantial evidence to support the limited weight given to Callewart's opinions. *Villa*, 895 F.2d at 1023-24.

Because the ALJ has not pointed to any medical evidence or to any other substantial evidence in the record to justify his rejection of the treating specialist's medical source statement, the court finds the decision--as to this issue-- must be reversed.

### 2. Must the ALJ Give Substantial Weight to the Opinions of the Treating Physician

Having concluded that the ALJ has failed to show good cause for not giving Dr. Callewart's medical source statement controlling weight, little needs to be said about the plaintiff's alternate argument that the opinions were entitled to substantial weight. Social security regulations provide that even if the opinions of treating physicians are not entitled to controlling weight, they "are still entitled to deference" and will frequently "be entitled to the

_____

[54] Strangely, the plaintiff's failure to disclose this work attempt is not mentioned by the ALJ as a reason for finding the plaintiff less than fully credible.

greatest weight and should be adopted, even if it does not meet the test for controlling weight."

20 C.F.R. § 404.1527. The opinion of a treating physician will generally be given great weight and such an opinion may be disregarded "only if there is persuasive contradictory evidence" in the record. *Coffman v Bowen*, 829 F.2d 515, 517 (4th Cir. 1987). Furthermore the opinions of a specialist, like Callewart, are typically given greater weight than that of a non-specialist. *Paul v. Shalala,* 29 F.3d 208, 211 (5th Cir. 1994).

Where the treating physician is the only examining source and the ALJ determines that it is not entitled to controlling weight, then the an ALJ is required to consider and discuss the six familiar factors of the treating physician's rule in order to decide the weight to be given to the treating physician's medical opinions. *Newton*, 209 F.3d at 456. The ALJ did not expressly weigh any of these factors when he gave little weight to the Callewart's medical opinions, and the defendant concedes this is error, but asserts that it is harmless error. The court agrees that the ALJ implicitly considered several of the factors in the decision when he discussed the different treatment notes, but he clearly did not consider all the factors. This failure coupled with the  scant support for his decision beyond his bald assertion that the treating physician's opinions are not supported by "the medical evidence" or the "evidence of record" does not satisfy the requirements of *Newton*.

### 3.  Residual Funcational Capacity

Next, the plaintiff argues the ALJ erred concerning his RFC.   Because an ALJ is not allowed to rely on his own unsupported medical opinions as to the limitations presented by the claimant's medical conditions, *Ripley v Chater*, 67 F.3d 552, 557, n. 27 (5th Cir. 1995), there must be evidence to support the ALJ's determination and the ALJ must be clear about that

evidence. While the ALJ is under no obligation to discuss every scrap of medical or other evidence to the satisfaction of the plaintiff, *Franzen v. Astrue*, 555 F.Supp.2d 720, 726 (N.D. Tex 2008), the problem here is there is nothing in this record to support the RFC. The defendant points out that the ALJ discussed Callewart's records in another portion of the record and again suggests that these bits and pieces parsed from the treatment records support the RFC, once more cherry-picking for those findings most favorable to the ALJ's opinion. Callewart's records as discussed above do not support the RFC and isolating findings that show Smith is not bed-ridden do not support the RFC assessment. The evidence in opposition to the finding is the claimant's testimony and his specialist's opinions. The only support to which the Commissioner can point are the rejected findings of non-examining physicians and the ALJ's personal judgment. *Ripley*, 67 F.3d at 557-58, *Balsamo*, 142 F.3d at 81-82.

Extrapolating the additional restrictions from the ALJ's hypothetical questions, and having examined the entire record, the court can find no substantial evidence to support the ALJ's determination that Smith can stand/walk for two hours a day and sit for six of eight hours, even with an at-will sit/stand option and room to move around at will to alleviate pain. The ALJ did not explain how he arrived at these additional restrictions. Consequently, the court finds the RFC is not supported by substantial evidence, and thus the decision cannot be affirmed.

### **ASSIGNMENT TWO: ASSESSMENT OF THE PLAINTIFF'S CREDIBILITY**

Because the ALJ observed Smith's testimony and his demeanor during his testimony, the job of evaluating the claimant's credibility falls to him, with only limited appellate review. Because the ALJ is in the best position to assess a witness' credibility, the determination made by the ALJ is entitled to great deference. *James v. Bowen*, 793 F.2d 702, 703 (5th Cir. 1986).

So long as the ALJ articulates credible and plausible reasons for rejecting a claimant's subjective complaint and there is substantial evidence to support the reasons given, the court will not upset the ALJ's credibility findings. *Falco*, 27 F.3d at 163.

Here the ALJ found that Smith's medically determinable impairments could explain the symptoms and pain he described, but refused to credit Smith's testimony that his symptoms were as intense or persistent as he described or that his symptoms limited him to the extent he claimed. Smith argues the ALJ failed to properly assess his credibility. Because the uncontroverted medical evidence shows a basis for Smith's complaints, the ALJ's unfavorable credibility determination will be upheld on appeal only if the "ALJ weighs the objective medical evidence and assigns articulated reasons for discrediting the claimant's subjective complaints of pain. *Abshire v Bowen*, 848 F.2d 638, 642 (5th Cir. 1988) (citing *Cook v. Heckler*, 750 F.2d 391, 395 (5th Cir. 1985)); *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984); 20 C.F.R §404.1529 and SSR 95-5p, 1995 WL 670415 (Oct. 31, 1995).

The ALJ listed nine grounds in support of his credibility determination. The defendant's brief again offers arguments to support the credibility determination not included in the decision. These arguments will not be addressed. The reasons offered are addressed in order given by the ALJ.

1. "On September 17, 2008, the claimant was involved in a motor vehicle accident, but the record shows no fractures or broken bones."

This unfounded medical opinion by the ALJ does not impeach the plaintiff's testimony. However much this test may appeal to the ALJ's "common sense" there is no medical evidence to support this supposition that the severity of the plaintiff's injuries in the accident, or his

condition thereafter, or the extent of his pain can be determined by this crude measuring stick.

2. "The finding by Dr. Callewart that the claimant is unable to engage in all work activity is not consistent with the credible evidence of the record, and is a question reserved solely to the Commissioner."

This is a conclusory statement attacking Callewart's opinions, not the plaintiff's credibility.

3. "In 2011, Dr. Callewart opined that the claimant opined that the claimant was unable to perform his past relevant work as a truck driver."

Again this is an attack on Callewart's opinions, rather than the plaintiff's credibility, but in any event, this stated reason does not impugn either the doctor or his patient. The ALJ found Smith incapable of returning to his past work as a truck driver in the decision.

4. "In 2011, Dr. Callewart found the claimant could lift and carry 10 pounds."

The court does not understand how this statement impacts Smith's credibility. Smith testified that he could lift a gallon of milk and put it into the cart, though he added that doing so would not be pain free. Because there is no conflict between the doctor's opinion and his patient's testimony, this statement does not provide a basis for discrediting Smith's testimony.

5. "In 2011, Dr. Callewart found that the claimant could handle moderate stress."

Again the court does not discern any material discrepancy between the doctor's opinion and his patient's testimony. While Smith did testify briefly about his mental problems, the court sees nothing in his testimony that is necessarily inconsistent with the this opinion.

6. "Dr. Ward found that the claimant could perform light work with no limitations."

The court fails to see how this impeaches Smith's testimony. Smith's testimony and his doctor's opinions are inconsistent with Ward's opinion, but the ALJ's rejected the opinion, finding the claimant could only perform a limited range of sedentary work.

7. "The claimant does not suffer from a severe mental impairment."

The plaintiff testified to being depressed, having anger issues, getting emotional, having racing thoughts, and difficulty sleeping. He was diagnosed with bi-polar disorder and depression. He did not specifically address nor was he asked about the impact of these problems on his work capacity.

8. "At the hearing the claimant denied the use of alcohol and drugs; however in 2012 Dr. Smith found that the claimant has a history of polysubstance abuse which was in partial remission, but the claimant continues to use marijuana 4 to 5 times per week'"

The court notes that the report of marijuana use was in April 2012. The hearing before the ALJ was in March 2013. The report in the mental health records in 2012 was that he had used alcohol three times in the previous year, but not to the point of intoxication. Smith also told the psychiatrist that in the previous year he had been using marijuana four to five times per month, not per week.

9. "There is no indication that the claimant's ability to carry out the activities of daily living is eroded to the extent that the claimant is unable to engage in all work activity."

This statement is too conclusory to aid the court in the review of this determination. The court notes that the ALJ found that Smith could only perform a limited range of sedentary work. Smith testified to his unsuccessful attempt to do a sedentary job and explained why he did not think he could do sedentary work because of problems with his legs giving way and cogently

explained that as he alternated between sitting and standing, the time he could tolerate the pain declined until he had to recline to get relief from the pain. While the ALJ did not have to accept his testimony, the court fails to see how the above stated reason impeaches anything Smith said.

Because the uncontradicted medical evidence established a medical basis for Smith's complaint of pain and because the ALJ has not offered cogent reasons supported by substantial evidence to justify the determination of credibility, the court finds the ALJ committed error in his credibility determination and that the error is not harmless.

## IV. CONCLUSION AND DECISION TO REVERSE

Having found multiple instances of prejudicial error, the court must now decide whether the plaintiff's remedy should be remand for further consideration or reversal, solely for computation of benefits

In determining whether to reverse the Commissioner's final decision and remand or to grant benefits without further administrative review, the court must look to the completeness of the record, the weight of the evidence in favor of the plaintiff, the harm to the claimant that further delay might cause, and the effect of a remand delaying the ultimate receipt of benefits by a deserving plaintiff. SOCIAL SECURITY DISABILITY LAW & PROCEDURE, § 9:49-§ 9.54, p. 1102-1118.129. The plaintiff has been seeking benefits for over five years. The plaintiff's treating physician has made the appropriate findings and the plaintiff, while waiting for benefits, has been unable to have the surgeries his physician recommends that will help his condition. In the face of convincing medical evidence, the Commissioner has rejected the claim.

The court seriously considered and, at one point in its deliberations, anticipated that it would likely remand this case only for calculation of benefits. The medical opinions provided

by Dr. Callewart are compelling.  Both because he is a specialist and because the Social Security regulations create what is akin to a presumption in favor of accepting those opinions, an ALJ wanting to provide little or no weight to Callewart's opinion would need to 1) obtain conflicting medical opinion from an examining source, or 2) cite to *compelling* non-medical evidence refuting the doctor's findings.  In this case, the ALJ has failed to do either.

While the court may not affirm or reverse a case based upon rationales or evidence not set out in the ALJ's opinion, the question whether to reverse for further consideration or reverse only for the calculation of benefits is addressed to the court's discretion.  There is one gap in the record-- caused by an apparent misrepresentation-- that is particularly troubling to the court.  The plaintiff was asked about where he had *last* worked.[55]  He testified about his attempt at office work in early 2012, but not about his later work attempt as a truck driver, in the fall of 2012, just months before the March 2012 hearing.[56]  At the very least the plaintiff testified erroneously, leading to the failure to develop the record about the details of this work attempt.  While a work attempt of unknown duration and scope is not sufficient to support the ALJ's decision, a sustained work attempt on a full-time basis, driving long distances, could not only justify an adverse finding on the claimant's credibility but also could undermine his doctor's opinions. While the ALJ bears some responsibility for not developing this part of the record, clearly the primary fault belongs to the plaintiff.

---

[55]  R.p. 40.

[56]  R.p. 311. Treatment note of October 29, 2012, from Helen Farabee Center.  Smith received mental health treatment and his therapist recorded that he was working as a truck driver at that time and considering taking a different truck driving job.  The ALJ's opinion states that he became aware of this job attempt in the testimony of he VE. The VE only mentioned truck driving as PRW.  Apparently the ALJ also saw this treatment note.

Furthermore, the court, in perusing the record, has found a document not referenced by either party which seems to indicate that Smith may have earned over thirteen thousand dollars in 2012.[57]  Because it appears to the court that another error may have occurred, the court finds that it should not reverse and render on the question of benefits, but instead finds that this matter should be remanded to the agency for further consideration.

A separate judgment consistent with this opinion shall be entered.

SO ORDERED AND ADJUDGED, this the 25th day of February, 2016.


/s/ David A. Sanders
UNITED STATES MAGISTRATE JUDGE

---

[57]  R.p. 149.